UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MONICA C. HOCKADAY**, | |
| Plaintiff, | |
| v. | Case No. 1:21-cv-03265 (TNM) |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, | |
| Defendant. | |

### MEMORANDUM OPINION

Plaintiff Monica Hockaday sues her former employer, the Washington Metropolitan Area Transit Authority (WMATA), for fostering a hostile work environment and retaliation. WMATA has moved for summary judgment. The Court will grant that motion because no reasonable jury could find for Hockaday. She complains only of ordinary workplace grievances, not severe or pervasive mistreatment. And WMATA's allegedly retaliatory acts are not actionable because they are not materially adverse. So the Court will grant WMATA's motion.

**I.**

The Court recounts the facts in the light most favorable to Hockaday. In 2002, WMATA hired Hockaday, an African American female, as a police officer in the Metro Transit Police Department (MTPD). Compl. ¶ 14. She was repeatedly promoted, eventually becoming a lieutenant. In 2008, she transferred to another division and began working with Lt. George Burns. She alleges that Burns created an environment where male officials were comfortable making sexist comments about female officers. *See* Interrog. at 8, ECF No. 13-19. Hockaday states that she reported these behaviors (though she does not state to whom). *See id.*

1

In 2009, Lt. Robert Kirkpatrick gave Hockaday a poor performance evaluation. *See id.* at 7. She spoke with Chief Michael Taborn about the evaluation and submitted written appeals. *See id.* Her evaluation was rewritten twice. *See id.* Chief Ronald Pavlik ignored her requests to review the final evaluation, instead submitting it to Human Resources. *See id.*

About a year later, Hockaday filed an EEOC complaint. *See id.* Apparently as a result of this complaint, Burns retired and was replaced by Lt. Brad Hanna. *See id.* Pavlik reportedly told Hanna to give Hockaday "a hard time" and "to make [her] life difficult." *Id.* at 6. Hanna shared this comment with Hockaday. According to Hockaday, Hanna did not personally comply but allowed others to do so. *See id.* at 7.

A few years later, Deputy Chief Ernhart Olson investigated Hockaday after one of her subordinates accused her of creating a hostile work environment. *See* Admin. Inquiry, ECF No. 13-3. That officer, along with several other officers under Hockaday's supervision, provided extensive descriptions of Hockaday's allegedly threatening, negative, and aggressive behavior. *See generally id.* Olson found that Hockaday's behavior was "unprofessional and unbecoming of an official of her rank." *Id.* at 10. He cited her "loss of composure by yelling, flailing of arms, and slamming of books and other objects." *Id.*

Olson recommended that Hockaday be issued a letter of reprimand and placed on a corrective action plan. *See id.* Pavlik review the investigation report, agreed with its findings, and approved that Hockaday receive a letter of reprimand. *See id.* at 1. Hockaday disclaims the allegations. *See* Interrog. at 7; Pl.'s Resp. to Def.'s Statement of Undisputed Mat. Facts (SUMF) ¶ 2, ECF No. 14-3. She claims that Olson later told her that he "knew the investigation was bullshit," and that Assistant Chief Rodney Parks similarly told her that the investigation was based on "implicit and explicit bias." *See* Interrog. at 7.

2

Four years later, Pavlik issued Hockaday another letter of reprimand after she admitted to sharing a photo of her colleague in a vulnerable position. *See* SUMF ¶ 3; 2d Letter of Reprimand, ECF No. 13-4.

In January 2018, Hockaday received a 24-hour suspension without pay after a Montgomery County police officer stopped her for a traffic infraction and she responded unprofessionally. *See* Interrog. at 4; SUMF ¶ 4. She denies wrongdoing and claims the suspension was in retaliation for a complaint she filed with Montgomery County alleging that the officer racially profiled her. *See* Interrog. at 4. According to Hockaday, Pavlik admitted that he liked the Montgomery County officer who initiated the stop and suspended her for that reason. *See id.* A senior employee relations officer concluded that the suspension was fairly handed out after investigating Hockaday's concerns. *See* SUMF ¶ 5.

In August 2018, Hockaday received a third letter of reprimand for failing to ensure that her assigned officers updated required records. 3d Letter of Reprimand at 2, ECF No. 13-7. Captain Peter Sepulveda conducted the investigation, and Pavlik approved the reprimand. *See id.* Hockaday says her failure resulted from inadequate training. *See* Interrog. at 6. And she claims that the real reason for the investigation and reprimand was that Sepulveda was retaliating against her for a complaint she made against him earlier that year. *See id.*

In November 2018, Hockaday filed a Charge of Discrimination with the D.C. Office of Human Rights and the EEOC alleging race and gender discrimination, as well as retaliation. *See* SUMF ¶ 7. Broadly speaking, she alleged that she was improperly reprimanded, given biased performance reviews, and subjected to sexist and racist remarks. *See* Letter from M. Hockaday to Ms. Colunga (Nov. 26, 2018) at 1, ECF No. 14-9.

That year, Hockaday received two more letters of reprimand for losing her police credentials and for crashing into a parked car.  *See* SUMF ¶¶ 9-10; ECF Nos. 13-9, 13-10. Pavlik reviewed the investigative reports and approved the reprimands.  *See* ECF Nos. 13-9, 13-10.

In 2020, WMATA investigated Hockaday and some colleagues for mishandling evidence.  *See* SUMF ¶ 11.  She received a 24-hour suspension.  *See id.*  Two other officers also received suspensions.  *See id.* ¶¶ 12–13.  Though Pavlik signed the letter authorizing this discipline, Hockaday objects that the investigation was initiated and conducted by a peer.  *See* Interrog. at 3.  According to her, this was not a normal practice.  *See id.*

A senior employee relations officer conducted a "comprehensive review" of her objections to the suspension and found that her concerns were unfounded.  *See* May 12, 2020, Mem., ECF No. 13-12.  Undeterred, Hockaday filed an internal complaint alleging race and gender discrimination and retaliation.  *See* SUMF ¶ 16; May 20, 2020, Discrim. Compl., ECF No. 13-13.

Soon after, Hockaday requested authorization to obtain outside employment.  *See* SUMF ¶ 17.  Deputy Chief Stephen Boehm denied this request given Hockaday's use of leave and work performance during the relevant ratings period.  *See* Emp. Denial at 2, ECF No. 13-14.  She alleges this denial violated various WMATA policies.  *See* Pl.'s Statement of Disputed Mat. Facts (Pl.'s SMF) ¶ 24.

In August 2020, Boehm completed Hockaday's 2019–2020 performance evaluation.  *See* 2020 Eval. at 4, ECF No. 13-16.  She was given a "Solid Performer" rating.  *See id.*

In September 2020, Hockaday was scheduled to meet with her immediate supervisor, Acting Captain Nopadon McKee, and Boehm to discuss her 2021 performance objectives.  *See*

2020 Emails at 5, ECF No. 13-18.  Hockaday felt uncomfortable and "bullied" by the presence

of Boehm, so she insisted that she have a third-party present "to even things out."  *Id.* at 5–6.

Boehm denied her request, cut the meeting short, and issued her an emergency 24-hour

suspension for insubordination.  *See id.*; Dep. of Monica Hockaday (Hockaday Dep.) at 4, ECF

No. 13-2.  The next day, the new police chief, Michael Anzallo, rescinded that suspension.  *See*

Hockaday Dep. at 8–9; Dep. of Daniel Alvarez (Alvarez Dep.) at 5, ECF No. 13-20.

Though the suspension was rescinded, Hockaday was placed on paid administrative leave

for about two weeks while the incident was investigated.  *See* 2020 Emails at 8.  Hockaday

claims this "discipline" was "humiliating" and uncalled for.  Hockaday Dep. at 13.

In October 2020, Hockaday filed a complaint with the D.C. Office of Human Rights

alleging race and gender discrimination, retaliation, and hostile work environment.  *See* Charge

of Discrim., ECF No. 13-17.  Among other things, she complained that she had been unfairly

overlooked for promotions, improperly disciplined, and denied reasonable accommodations.  *See*

*id.* at 1–2.

Hockaday filed this lawsuit in December 2021 and retired in April 2022.  *See* SUMF ¶ 1.

After discovery, WMATA moved for summary judgment.  *See* Def.'s Mot. for Summ. J. (MSJ),

ECF No. 13.  The Court has jurisdiction under the federal question statute, 28 U.S.C. § 1331.

**II.**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to

any material fact" so that he "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Thus, to defeat a properly supported motion for summary judgment, the nonmovant must set

forth "specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  But "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249–50.

In this posture, the Court must "view the facts and draw reasonable inferences in the light more favorable to the" nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (cleaned up).

**III.**

The Court considers Hockaday's (A) hostile work environment claim and her (B) retaliation claim.

**A.**

Consider first Hockaday's hostile work environment claim.  She claims that WMATA employees mistreated her for her gender, race, and protected activity.[1]  *See generally* Compl. WMATA responds that Hockaday has not shown severe or pervasive workplace misconduct. *See* MSJ at 4–7.  WMATA is correct.

To win, Hockaday must show that WMATA subjected her to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (cleaned up).

To evaluate this claim, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir.

---

[1]  WMATA reasonably argues that Hockaday limited her Complaint to allegations of discrimination based on gender and protected activity.  *See* Reply at 1.  Hockaday's pleadings are indeed confusing.  *See* Compl. ¶ 38 (alleging discrimination "[a]s a result of [her] protected status (female gender) and participation in protected activity"); *id.* ¶ 40 ("she was subjected to a hostile work environment based on her gender (female) and her protected activity").  The Court rejects this argument, however, because Hockaday later mentions mistreatment because of her race.  *See* Compl. ¶ 43.

2008).  The collective mistreatment "must be extreme."  *Faragher v. City of Boca Raton*, 524

U.S. 775, 788 (1998).  So unless they are "extremely serious," "isolated incidents" and "offhand

comments" will not do.  *Id.* (cleaned up).  This is an objective standard.  *See Wade v. District of*

*Columbia*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011).

These "demanding" standards exist because Title VII is not "a general civility code."  *Id.*

Indeed, "this is a difficult claim to successfully advance."  *Arnoldi v. Bd. of Trs., Nat'l Gallery of*

*Art,* 557 F. Supp. 3d 105, 120 (D.D.C. 2021), *aff'd*, 2022 WL 625721 (D.C. Cir. Mar. 1, 2022).

Hockaday says summary judgment is improper because she "raised incidents" of

discrimination by or ratified by her supervisor, Chief Pavlik.  Opp'n at 6.  But Hockaday has

provided no record evidence in support.  *See id.*  In this part of her opposition—which is less

than a page long—she does not include a single citation to the record.  *See id.*

The summary judgment standard demands more.  Parties must "cit[e] to particular parts

of materials in the record."  Fed. R. Civ. P. 56(c).  A party opposing summary judgment must

point to "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986) (cleaned up).  And this Court "need consider only . . . cited materials."

Fed. R. Civ. P. 56(c).  Hockaday is not proceeding pro se.  And "[t]his Court is not in the habit of

doing parties' lawyering for them."  *Jeffries v. Barr*, 965 F.3d 843, 860–61 (D.C. Cir. 2020).

Courts "are not like pigs, hunting for truffles buried in briefs or in the record."  *Jones v.*

*Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) (cleaned up).

Hockaday's entire argument in support of this claim is that her "allegations consisted of,

but [are] not limited to" the denial of promotions resulting from unfair discipline, suspensions,

poor performance evaluations, administrative leave, and investigations.  Opp'n at 6 (citing

Compl. ¶¶ 1, 17, 19–29, 33–36).  That dog will not hunt.  It should come as no surprise that "a

mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment." *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993) (cleaned up).  To accept Hockaday's bald allegations "would defeat the central purpose of" summary judgment— "which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Green v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

Hockaday's total failure to support her allegations with record evidence (or any real argument) dooms her hostile work environment claim.

In any event, the Court has independently reviewed the record and finds her allegations of mistreatment do not meet the "demanding" standard applicable to such claims. *Faragher*, 524 U.S. at 788.  WMATA's first interrogatory asked Hockaday to detail "all facts supporting" her hostile work environment claim.  *See* Interrog. at 1.  The events she describes there and in her Complaint—a disconnected list of grievances spanning nearly 15 years—do not suggest she endured "pervasive" or "severe" discriminatory conduct.  *Harris*, 510 U.S. at 21.

Start with her protest about poor performance evaluations.  She objects to two allegedly poor evaluations given eleven years apart by different supervisors.  *See* Interrog. at 7; 2020 Eval.; Compl. ¶ 27.  The first is not in the record and occurred 14 years ago.  *See* Interrog. at 7.  And she was given a "solid performer" rating in the second.  *See* 2020 Eval. at 4.  More, the review in the record "recommended areas of improvement—hardly the stuff of severe or pervasive workplace hostility." *Brooks v. Grundmann*, 738 F.3d 1273, 1277 (D.C. Cir. 2014).  Regardless, "lowered performance evaluations" cannot be "characterized as sufficiently intimidating or offensive in an ordinary workplace context." *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009).

She similarly laments receiving two letters of reprimand (in 2014 and 2018) approved by

Pavlik.  *See* Interrog. at 2, 3.  As we will see, the "legitimate reasons" offered for each reprimand

"undercut" her claims of mistreatment.  *Baloch*, 550 F.3d at 1201.

Pavlik approved the first reprimand based on a detailed investigative report prepared by

Olson.  *See* 1st Letter of Reprimand at 1.  After one of Hockaday's inferiors accused her of

creating a hostile work environment, Olson investigated and concluded that Hockaday's behavior

was "unprofessional and unbecoming" of a lieutenant, a second-line supervisor.  *Id.* at 10.  He

specifically noted her "loss of composure by yelling, flailing of arms, and slamming of books

and other objects."  *Id.*  And Pavlik approved the second reprimand following an investigation

conducted by Sepulveda, who found that Hockaday "failed to ensure" her inferiors complied

with WMATA's records policy.  *See* 3d Letter of Reprimand at 1–2.

If Hockaday is right that these reprimands were based on "bias" or "stereotypes,"

Interrog. at 6, these minor disciplinary measures do not show the kind of pervasive or severe

mistreatment needed to sustain a hostile work environment claim.  Petty work-related actions

such as these—even when combined with "negative evaluations, less favorable treatment in the

workplace," and "hurtful comments"—"seldom" give rise to a hostile work environment.  *Reed-*

*Morton v. Fudge*, No. 22-cv-1079, 2022 WL 16571237, at *9 (D.D.C. Nov. 1, 2022).

Hockaday also complains about three occasions in which she was given a 24-hour

suspension.  *See* Interrog. at 3, 4.

The first suspension resulted from her behavior when she was stopped by a Maryland

officer.  An investigation concluded her that "behavior and actions . . . were not up to the

standards expected of an MTPD Official."  *See* Jan. 4, 2018, Mem., ECF No. 13-5.  According to

her, the suspension really was in retaliation for a complaint she filed against the officer who

9

pulled her over.  A senior employee relations officer disagreed, finding the suspension was fairly

handed out.  *See* SUMF ¶ 5.  She retorts that the suspension was "biased" and "non-factual"

because Pavlik allegedly stated that he "likes th[e] guy" whom she filed a complaint against.

Interrog. at 5.

Two years later, she was suspended following an investigation by Lt. Beau Perrizo, who

found that Hockaday mishandled evidence.  *See* Admin. Invest. Rep., ECF No. 13-11.  After

Hockaday called foul, a different senior employee relations officer conducted a "comprehensive

review" of her objections and found that her concerns were unfounded.  *See* May 12, 2020,

Mem.  Again, Hockaday has offered no evidence to show this suspension was based on any

protected characteristic or in retaliation for protected conduct.  So too with her 24-hour

suspension for insubordination, *see generally* 2020 Emails, which was rescinded the next day.

*See* Alvarez Dep. at 5; Hockaday Dep. at 8–9.

As with her performance reviews and reprimands, the "legitimate reasons" asserted for

the suspensions "undercut" her allegations of hostile work environment.  *Baloch*, 550 F.3d at

1201.  And she has provided no evidence beyond her own statements that the suspensions were

motivated by race, gender, or her participation in protected activity.

More, courts in this district have found that longer suspensions than those complained of

here still amount to "ordinary tribulations of the workplace" that fall outside the scope of Title

VII.  *Faragher*, 524 U.S. at 787; *see, e.g.*, *Taylor v. Haaland*, No. 20-cv-3173, 2022 WL 990682,

at *5 (D.D.C. Mar. 31, 2022) (12-day suspension combined with allegations of taunting

comments and unfair investigations did not state a hostile work environment claim); *Jimenez v.*

*McAleenan*, 395 F. Supp. 3d 22, 37 (D.D.C. 2019) (three-day suspension and "various

performance-based allegations" did not create a hostile work environment).  So Hockaday's brief suspensions carry little weight.

Hockaday is also wrong that her placement on administrative leave created a hostile work environment.  She says that she was improperly placed on leave for around two weeks following the altercation with Boehm that led to the emergency suspension.  *See* 2020 Emails at 8; Compl. ¶ 34.  Though she was paid while on leave, Hockaday claims this "discipline" was "humiliating." Hockaday Dep. at 13.  But, again, "[o]ccasional instances of less favorable treatment involving ordinary daily workplace decisions are not sufficient to establish a hostile work environment." *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005).  And like her other allegations, Hockaday has provided no evidence beyond her own speculation that she was placed on leave because of her race, gender, or in retaliation for protected conduct.

Hockaday's other complaints fare no better.  She alleges that: (1) a former supervisor in 2008 allowed other officers to make gendered remarks; (2) a colleague in 2010 told her that Pavlik wanted said colleague to give Hockaday a "hard time"; (3) a peer in 2019 was not disciplined for violating MTPD policy; and (4) she was denied outside employment in 2020.  *See generally* Interrog.  These submissions do not persuade.

Even when combined with her other grievances, these conclusory assertions of mistreatment do not suggest that she faced severe, pervasive, or abusive behavior.

*First*, "sporadic use of . . . gender-related jokes" is not policed by Title VII.  *Faragher*, 524 U.S. at 788.  *Second*, "the hearsay statement offered by plaintiff counts for nothing," and in any event is neither extreme nor abusive.  *Sewell v. Chao*, 532 F. Supp. 25 126, 141 (D.D.C. 2008).  *Third*, that a peer was not disciplined for conduct Hockaday found objectionable "is not evidence of intimidation and ridicule directed at" her.  *Uzuokwu v. Metro. Wash. COG*, 130 F.

Supp. 3d 403, 415 (D.D.C. 2015). *Fourth*, denial of outside employment is the sort of "ordinary tribulation[] of the workplace" that is not so "extreme to amount to a change in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

"Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012). This principle is especially relevant here where the only evidence of discrimination or retaliation is Hockaday's own speculation and hearsay statements. Without more supporting evidence, Hockaday's "unsupported *ipse dixit* does not create a triable issue of fact." *Clarke v. WMATA*, 904 F. Supp. 2d 11, 17 (D.D.C. 2012).

More still, "[t]he acts in question must be . . . adequately linked such that they form a coherent hostile environment claim." *Menoken v. Dhillon*, 975 F.3d 1, 6 (D.C. Cir. 2020). "To determine whether a group of alleged acts is sufficiently linked, courts often consider whether the acts in question involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.*

This rubric further dooms Hockaday's claim. She has not shown an adequate connection between her asserted instances of mistreatment. The grievances span nearly 15 years. *Cf. Nurriddin*, 674 F. Supp. 2d at 94 ("the alleged events are temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness"). She blames at least five supervisors and various unnamed colleagues. *Cf. Hinds v. Mulvaney*, 296 F. Supp. 3d 220, 245 (D.D.C. 2018), *aff'd,* 2019 WL 5432064 (D.C. Cir. Mar. 28, 2019) (denying discrimination claims involving alleged incidents over a two-year period and numerous supervisors). And as we have seen, the types of slights she complains of run the gamut. At best, Hockaday has identified an "array of unrelated discriminatory or retaliatory acts." *Baird*, 662 F.3d at 1252.

12

Hockaday has not shown a hostile work environment.  *Accord Smith v. McMahon*, 239 F. Supp. 3d 57, 74 (D.D.C. 2017) (granting employer summary judgment when plaintiff alleged "a motley mix of adverse actions, spread out over the course of nearly a year, and carried out by different managers").

**B.**

Consider next Hockaday's retaliation claim.  Under Title VII, it is unlawful for an employer to retaliate against an employee who opposes or formally complains about illegal workplace practices.  *See* 42 U.S.C. § 2000e-3(a).  Hockaday says WMATA retaliated against her after she made an internal complaint of discrimination in 2020.  The Court disagrees.

Hockaday "must first establish a prima facie case."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  That means she must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) the two are causally connected.  *See id.*

WMATA addresses only the second prong of the test.  *See* MSJ at 8–10.  It argues that each of the actions identified by Hockaday are not materially adverse.  *See id.*  An action is materially adverse only if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe. R.R. Co. v. White*, 548 U.S. 53, 63 (2006) (cleaned up).  This requirement exists to "separate significant from trivial harms." *Id.*  Thus, "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001) (cleaned up).

A material adverse action typically involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Bridgeforth v. Jewell*, 721

F.3d 661, 663 (D.C. Cir. 2013) (cleaned up).  So a retaliation claim cannot be based on "petty slights or minor annoyances" that are typical of the workplace.  *Id.* (cleaned up).  A plaintiff must show "an objectively tangible harm."  *Id.*

Hockaday alleges four materially adverse actions.  These actions followed her May 2020 internal complaint of discrimination.  *See* Opp'n at 8.  Specifically, she identifies (1) the denial of outside employment; (2) a subpar 2019–2020 performance review; (3) the withdrawn 24-hour emergency suspension; and (4) being placed on administrative leave.  *See id.* at 8–9.  The Court takes each in turn.

*First*, Hockaday complains that Boehm denied her request for outside employment. Boehm explained the denial was based on her excessive use of sick leave and her three-day suspension during the rating period.  *See* Emp. Denial at 2.  Hockaday produced no evidence that this explanation was pretextual.  Indeed, she does not allege that the three-day suspension was unwarranted.  Nor does she claim that she was treated less favorably than similarly situated employees.

In any event, the denial does not constitute a materially adverse action.  It had no bearing on the terms, conditions, or privileges of her employment because she did not have secondary employment approval before her protected activity.  Though the denial might have inflicted indirect economic harm on Hockaday, it was not "a significant change in employment status" akin to "hiring, firing, failing to promote, [or] reassignment with significantly different responsibilities." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *accord Sloan v. Miami Dade Fire Rescue*, No. 18-21517, 2019 WL 2869067, at *3 (S.D. Fl. July 3, 2019) ("denial of outside employment cannot alone constitute an adverse employment action without [plaintiff] demonstrating how that decision affected the terms, conditions, or privileges of her

14

position with the County" (cleaned up)).  More, Hockaday's filing of a charge of discrimination

just a few months after the denial undercuts her claim that such an action would "dissuade[] a

reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548

U.S. at 57; *see* Charge of Discrim., ECF No. 13-17.

     *Second*, Hockaday's receipt of a "solid performer" rating in her 2019–2020 review does

not constitute an adverse action.  A performance evaluation is only materially adverse if it

"affect[s] the employee's position, grade level, salary, or promotion opportunities."  *Taylor v.*

*Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009).  Hockaday alleges that this rating resulted in her not

receiving "the level of a cash award that she deserved."  Compl. ¶ 28.  But there is no reference

in the record (or in her opposition) to any purported cash reward attached to performance

reviews.  She has not met her burden "to show the evaluations were attached to financial harms."

*Taylor*, 571 F.3d at 1321.

     *Third*, Hockaday asserts that her placement on paid administrative leave was materially

adverse.  The Court disagrees.  Several judges in this district have held that "placing an

employee on paid administrative leave does not, in and of itself, constitute an adverse

employment action."  *Hornsby v. Watt*, 217 F. Supp. 3d 58, 65 (D.D.C. 2016) (collecting cases);

*see also Joseph v. Leavitt*, 465 F.3d 87, 90–91 (2d Cir. 2006) (finding placement on paid leave

not an adverse action in the Second, Fourth, Fifth, Sixth, and Eighth Circuits).

     *Fourth*, Hockaday's emergency 24-hour suspension following her altercation with

Boehm was also not materially adverse.  The suspension was rescinded the next day, and

Hockaday lost no pay.  *See* Alvarez Dep. at 5; Hockaday Dep. at 8–9.  There is no evidence this

withdrawn suspension affected her "position, grade level, salary, or promotion opportunities."

*Taylor*, 571 F.3d at 1321.

None of the actions Hockaday asserts can sustain her claim of retaliation.

**IV.**

The record portrays an African American woman who rose through the ranks of the MTPD over her two-decade career.  Like many employees, she also received episodic discipline for various infractions during that time.  Though she points to stray incidents that were frustrating and perhaps could have been handled better, she has shown no violation of the law. So the Court will grant WMATA's motion for summary judgment.

A separate Order will issue today.

<br>

Dated:  June 6, 2023                                                TREVOR N. McFADDEN, U.S.D.J.